```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION


William Hesson, on behalf
of JDH,                           :

        Plaintiff,                :

    v.                            :    Case No. 2:13-cv-926

                                  :    JUDGE JAMES L. GRAHAM
Commissioner of Social                 Magistrate Judge Kemp
    Security,                     :

        Defendant.                :
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, William Hesson, filed this action on behalf of his son, J.D.H. seeking review of a decision of the Commissioner of Social Security denying J.D.H.'s application for supplemental security income.  That application was protectively filed on June 3, 2010, and alleged that J.D.H. became disabled on January 1, 2000.

After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on March 7, 2012.  In a decision dated March 27, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on August 6, 2013, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on January 10, 2014.  Plaintiff filed his statement of specific errors on February 7, 2014.  The Commissioner filed a response on May 14, 2014.  No reply has been filed, and the case is now ready to decide.

II. The Testimony at the Administrative Hearing

The transcript of the administrative hearing is found at pages 34 through 59 of the administrative record.  The following

is a summary of the testimony given at the hearing.

The only witness to testify was J.D.H.'s father William. In testimony beginning at page 40 of the record, he said that he noticed J.D.H. having some anger issues at age 6 or 7. He would get into fights at school. That had not changed from kindergarten through seventh grade. The police had become involved on several occasions, although J.D.H. had never been arrested. There had been occasions where he punched holes in the wall of his home.

William also testified that his son's mood was volatile and that he had difficulty getting him to complete chores. J.D.H. got along adequately with his brothers. Getting him to do homework was almost impossible, and his grades were poor. He had been on individualized educational plans at school due to his behavior. At the time of the hearing, he had been placed in an alternative school, and had been suspended from it several times. He took medication for hyperactivity and for mood stabilization. He experienced some side effects from medication, including walking and talking in his sleep. He was not good about reacting to criticism.

Finally, William said that J.D.H. needed reminders about everything, including basic hygiene and grooming. He did not miss much school, although it was a struggle to get him there. He did draw very well. However, he was very impulsive and outspoken.

### III. The Medical and Educational Records

The medical and educational records begin at page 137 of the administrative record. They contain the following information pertinent to this case.

One of J.D.H.'s teachers completed a questionnaire on October 8, 2007. At that time, J.D.H. had been in his class (fourth grade) for six weeks. He identified obvious problems in

several areas including reading comprehension and expression and focusing in class, and said that J.D.H. needed a quiet area to work in.  He did not see the level of support being provided as unusual and said three or four other students needed the same accommodations.  (Tr. 158-65).  His cumulative school records through the sixth grade showed that he began receiving failing grades as early as fourth grade and had at least two failing grades in each of his fourth, fifth, and sixth grade years.  (Tr. 234-35).

There are a number of records from the seventh grade year showing suspensions for fighting or disrespect toward school staff, as well as some vandalism.  There is also an IEP for J.D.H.'s eighth grade year which highlights behavioral problems and notes that he benefitted from "small, heavily structured instruction groups, frequent redirections, and frequent repetition of instructions."  He was reading in the low average range and his math skills were below average.  He was noted to be frequently absent from school and strayed from assigned work when in attendance.  The form showed that he had a full scale IQ of 85, slightly lower than a prior score, and that his weaknesses were in working memory and processing speed.  Finally, the form referred to a diagnosis of ADHD and bipolar disorder.  (Tr. 247-68).

J.D.H. was ordered to complete 20 hours of community service as part of a diversion program.  He did so successfully but was easily distracted when a second boy was assigned to the same program.  (Tr. 270).

J.D.H. was evaluated by Dr. Sarver when he was nine years old.  At that time, although he was doing poorly in school, he had not failed any grades.  He had been suspended from school and had difficulty with lying and stealing, but had "friends and age appropriate peer interests."  J.D.H.'s behavior and appearance

were appropriate and he had no language problems. He did not exhibit characteristics of ADHD. Dr. Sarver diagnosed oppositional-defiant disorder and a conduct disorder and rated J.D.H.'s GAF at 57. Dr. Sarver expected him to have issues with working toward goals or containing his anger and frustration. (Tr. 279-84).

Dr. Semmelman, a psychologist, completed a form on February 4, 2008, indicating that J.D.H. did not satisfy any Listing. She thought he had no marked limitations in any of the six relevant categories, and no limitation in four; he had less than marked limitations in the areas of attending and completing tasks and interacting and relating with others. (Tr. 286-91). Dr. Johnston, another reviewer, generally concurred in a form completed in 2010, although she found a marked limitation in the area of interacting and relating with others. (Tr. 315-19). Dr. Voyten evaluated the same factors in a December 10, 2010 report, finding additional limitations ("less than marked") in some areas, but still concluding that only one marked limitation existed. (Tr. 322-36).

Dr. Sams, a psychiatrist who had treated J.D.H. for five years, completed a mental status questionnaire in 2011. He noted that J.D.H. had severe problems in the area of mood and affect, with an unstable mood, and suffered from misperceptions about people and their actions. He was also easily distracted and had poor insight and judgment. His response to medication was inconsistent and he had trouble completing tasks. (Tr. 328-30). An earlier form showed that some of J.D.H.'s symptoms were improved with medication. (Tr. 360-61).

Dr. Lee, a psychologist who did a diagnostic assessment of J.D.H., reported in 2010 that the testing supported a diagnosis of ADHD and bipolar disorder, with prominent behavioral problems and a mild to moderate disruption in the ability to think

-4-

logically and coherently.  Dr. Lee also diagnosed ADHD and bipolar disorder and rated J.D.H.'s GAF at 50.  (Tr. 331-36).

Patricia Sams, a clinician at the Worthington Center, where Dr. Sams is also employed, reported on February 27, 2012 that J.D.H. had bee a patient since 2006.  She said that he experienced frequent mood swings, blind rages, poor impulse control, low tolerance for frustration, poor persistence and pace, sleep disturbance, low self esteem, difficulty with authority, and inability to follow simple instructions.  She believed that his illness was "chronic and debilitating" and that his prognosis was poor.  (Tr. 427).

Finally, the record contains a one-pate report from Rebecca Savage of Heath Recovery Services, Inc.  A diagnostic assessment at that facility indicated diagnoses of disruptive behavior disorder, alcohol abuse, and nicotine dependence.  She could not speculate on the severity of his disorders but said that someone with those diagnoses had a fair to good prognosis.  (Tr. 428).

### IV.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 15 through 29 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that J.D.H. was an adolescent on the date the application was filed and was an adolescent as of the date of the hearing.  The ALJ next found that he had not engaged in substantial gainful activity from his application date forward.

Concerning impairments, the ALJ found that J.D.H. had severe impairments including ADHD, oppositional defiant disorder, and bipolar disorder.  He also found that these impairments, taken singly or in combination, did not meet or equal any impairment listed in the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).  Additionally, he found that the

impairments were not the functional equivalent of any impairment described in the Listing of Impairments.  This finding was based upon an analysis of six different domains of functioning, as required by the regulations relating to a child's disability claim.  The ALJ found a marked impairment in only one area of functioning, that of interacting and relating to others; as to the other five areas, the ALJ found either that J.D.H.'s impairment was "less than marked" or that he had no impairment at all.  Because a claim of disability filed on behalf of a child can be granted only if he or she has a marked impairment in two of these areas or an extreme impairment in one, the ALJ denied the claim.

V.  Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff raises a single issue.  He contends that the ALJ erred in finding that J.D.H. did not have a marked impairment in the area of attending to and completing tasks.  The Court reviews the administrative decision under this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is

supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

The regulations concerning a child's application for disability benefits set out a somewhat different framework than the one which governs applications by adults.  As the Court of Appeals has summarized that procedure,

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? *** An impairment can equal the listings medically or functionally ***. The criteria for functional equivalence to a listing are set out in §416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
>
> (2) Attending and completing tasks;
>
> (3) Interacting and relating with others;
>
> (4) Moving about and manipulating objects;
>
> (5) Caring for yourself; and
>
> (6) Health and physical well-being.
>
> § 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions

>for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:
>
>"Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
>
>§ 416.926a(e)(2)(i).
>
>"Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.
>
>§ 416.926a(e)(3)(i).

Kelly v. Commissioner of Social Sec., 314 Fed. Appx. 827, 832 (6th Cir. February 2, 2009).

The only issue raised by Plaintiff relates to attending and completing tasks.  As stated in §416.926a(h), this domain considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them."  It explains how this is determined for various age groups:

>(iv) School-age children (age 6 to attainment of age 12). When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when

-8-

    appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

    (v) Adolescents (age 12 to attainment of age 18). In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

The regulation also offers these examples of what may constitute a significant impairment in this area:

    (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

    (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

    (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

    (iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

    (v) You require extra supervision to keep you engaged in an activity.

In considering the extent of J.D.H.'s impairment in this area, the ALJ cited the appropriate law.  He then reviewed the

evidence, placing particular emphasis on these portions of the record: (1) the report from the fourth grade teacher that J.D.H. needed a quiet place to work in order to avoid distractions; (2) Dr. Sarver's conclusion that J.D.H.'s concentration was appropriate and his memory and attention were functionally intact; and (3) the letter concerning J.D.H.'s community service, which indicated that he completed his tasks appropriately. (Tr. 24-25). As noted above, the fourth grade teacher's evaluation also explained that J.D.H.'s need for a quiet place to work was not out of the norm. Earlier in the decision, the ALJ also gave great weight to Dr. Johnston's opinion and some weight to the opinions of Drs. Semmelman and Voyten, all of whom viewed J.D.H.'s limitations in this area to be "less than marked." (Tr. 22).

    Plaintiff does not contend that any of these pieces of evidence were not in the record or were improperly characterized by the ALJ. He also does not argue that the ALJ was not entitled to consider them. Rather, he asserts that there is other evidence to support a finding of a marked limitation, including some of the other comments made by Dr. Sarver in his report, a comment made by Mr. Rood, the community service supervisor, to the effect that J.D.H. was distracted by another youth assigned to the program, and some notes from Dr. Sams and the Worthington Center about J.D.H.'s difficulty in completing tasks.

    First, with respect to Dr. Sarver's and Mr. Rood's reports, the ALJ's reading of them as a whole, taking into account all of their content, is at least as consistent with the ALJ's version of their import as is the interpretation offered by Plaintiff. In other words, a reasonable person could have interpreted them as supportive of the ALJ's finding, meaning that they provide substantial evidence for that conclusion.

    The only other evidence to which Plaintiff points are some

-10-

notes made by Dr. Sams and the Worthington Center.  They do not state, unequivocally, that J.D.H.'s impairment in this area was marked, as defined by the Social Security regulations, but would support an inference of a significant impairment.  However, that is not the test for determining whether to uphold an ALJ's decision.  The question is not whether a different conclusion could also be reached; the question is whether the record provides substantial support for the conclusion actually reached.

     The presence of substantial evidence to support the opposite conclusion says nothing about whether the record would permit either conclusion to be drawn, and has consistently been rejected as a basis for overturning an ALJ's decision. See, e.g., Kalmbach v. Comm'r of Social Security, 409 Fed. Appx. 852, 859 (6th Cir. Jan.7, 2011) ("If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, we are not at liberty to reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion").  Here, the ALJ had before him four expert reports - one from Dr. Sarver, who performed a consultative examination, and three from state agency reviewers - which said that J.D.H. did not have a marked impairment in at least two areas of functioning.  There is no opinion evidence to the contrary, and only snippets of comments from either Dr. Sams or some school records which would support the opposite conclusion.  Conversely, there are school records which also support the ALJ's finding.  If the Court were to reverse on this record, it would simply be substituting its judgment for that of the ALJ, something the Court is not entitled to do.  "The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the court's judgment for that of the ALJ."  Suesz v. Comm'r of Social

Security, 2014 WL 4162555, *8 (S.D. Ohio Aug. 20, 2014). Consequently, there is no basis for overturning the ALJ's decision, and Plaintiff's statement of error lacks merit.

## VI. Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## VII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge